Vacated and remanded by published opinion. Judge KEENAN wrote the *687 majority opinion, in which Judge URBANSKI joined. Judge NIEMEYER wrote a dissenting opinion.
OPINION
BARBARA MILANO KEENAN, Circuit Judge:
Prentiss Watson was convicted by a jury of possession of a firearm by a felon, and of possession of ammunition by a felon, each in violation of 18 U.S.C. § 922(g). On appeal, he challenges the district court’s denial of his motion to suppress an incriminating statement he made after being detained by police for three hours without probable cause. The detention occurred inside a convenience store where Watson was working, while the police awaited authorization for a search warrant involving drug-related activities of other persons.
After the district court denied Watson’s motion to suppress, Watson was convicted of both offenses following a four-day jury trial. He argues that the district court erred in denying his motion to suppress because his incriminating statement was the product of an illegal detention. Upon our review, we hold that: (1) Watson’s three-hour detention constituted an unlawful custodial arrest in violation of his Fourth Amendment rights; (2) the taint of the unlawful custodial arrest was not purged by the two Miranda warnings provided during his detention or by any intervening circumstance; and (3) the erroneous admission of Watson’s statement was not harmless error. Accordingly, we vacate Watson’s convictions, and remand the case to the district court.
I.
Watson worked at a convenience store, which was located at 2700 Tivoly Avenue (the building) in Baltimore, Maryland. He also lived in the building, in a room located on the second floor. There were two other rooms located on that floor.
On February 23, 2010, detectives employed by the Baltimore City Police Department (the officers) were conducting surveillance of the block on which the building is located. After the officers observed some individuals engaging in suspected drug transactions near the building, the officers made several arrests. Anthony Jackson, who lived in a second-floor room in the building and was one of the individuals arrested, had been observed entering and leaving the building during the course of a suspected drug transaction. The officers thought that Jackson was carrying a weapon at the time of the suspected drug transaction[1] but, when Jackson was arrested after leaving the building, the officers did not find a weapon on his person.
After arresting Jackson, the officers decided to obtain a search warrant for the building. At that point, one of the officers, Detective Richard Jamison, began preparing the search warrant application, while several other officers entered the building to secure it and to prevent the destruction of evidence. As described by Detective Jamison, law enforcement officers in Baltimore City generally secure a building as follows:
[W]e make entry, in general, and always, we check every location a human being could be to make sure that we’re all safe, and we don’t have armed suspects in the [building]. We take those individuals. We secure them in a central location where they could be *688 watched for everyone’s safety. And then we get the warrant, assuming we don’t already have a warrant.
The officers’ efforts to secure the building were in conformance with these procedures. Upon entering the building, the officers encountered two individuals in the convenience store section of the building, Keta Steele, the owner of the store, and Watson. The officers immediately instructed Watson and Steele to “sit down,” and advised them of their rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Neither Watson nor Steele was among the individuals the officers observed engaging in the suspected drug transactions near the building, and the officers did not have information linking Watson or Steele to criminal activity of any kind.
The officers kept Watson and Steele in the back area of the store for about three hours while waiting for Detective Jamison to return with a search warrant.[2] During this time, the officers did not inform Watson or Steele that they were free to leave, nor did the officers ask Watson or Steele any questions about the criminal activity observed near the building.
When Detective Jamison returned to the building with the search warrant, the officer who had restrained Watson again advised him of his Miranda rights while Detective Jamison began a search of the second-floor rooms. During his search of the second floor, Detective Jamison observed a shotgun in the “back room,” and returned to the first floor to ask Watson about the shotgun. Watson replied that he knew nothing about a shotgun, and stated that he lived in the “front room” on the second floor.[3]
Detective Jamison returned to the second floor to search the front room, where he observed a zipped toiletry bag lying near Watson’s closet.[4] When Detective Jamison opened the bag, he found a revolver and ammunition of various types. After recovering these items, Detective Ja-mison asked Watson about them. At that time, Watson replied, referring to the revolver: “[T]hat old thing, it doesn’t even work.”
Before trial, Watson filed a motion to suppress his statement on Fourth Amendment grounds, seeking to exclude from evidence the response he made to Detective Jamison about the revolver. Watson argued that he was subjected to an unlawful detention without probable cause, and that his statement should be suppressed as the product of an illegal arrest. The district court denied Watson’s motion.
The case proceeded to trial, after which the jury found Watson guilty of both counts of violating 18 U.S.C. § 922(g).[5] The jury’s deliberations lasted for a period of more than nine hours, during which the jury twice asked the court to read portions of Detective Jamison’s testimony concerning Watson’s statement about the revolver.
The district court sentenced Watson to two concurrent terms of imprisonment of *689 31 months. Watson filed a timely notice of appeal.
II.
On appeal, Watson challenges only the district court’s denial of his motion to suppress. We review the district court’s factual findings regarding the motion to suppress for clear error, and the court’s legal conclusions de novo. United States v. Burgess, 684 F.3d 445, 452 (4th Cir.2012); United States v. Edwards, 666 F.3d 877, 882 (4th Cir.2011). When, as here, a motion to suppress has been denied, we view the evidence presented in the light most favorable to the government. United States v. McBride, 676 F.3d 385, 391 (4th Cir.2012).
A.
We first address the question whether Watson was “seized” within the meaning of the Fourth Amendment. A seizure warranting Fourth Amendment protection occurs when in view of the totality of the circumstances, a reasonable person would not feel free to leave or otherwise to terminate an encounter with police. United States v. Lattimore, 87 F.3d 647, 653 (4th Cir.1996) (citing Florida v. Bostick, 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). As a general rule, a seizure requires either the use of physical force or, absent the use of such force, a submission to an officer’s assertion of authority. California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).
The government concedes that Watson was “seized” at the time of his initial detention. We agree that a seizure occurred here, because a reasonable person in Watson’s position would not have felt “free to leave” the area of the building in which he was held, or otherwise to terminate the encounter with the officers. When the officers entered the building, they instructed Watson to “sit down,” informed him of his Miranda rights, and kept him confined to a limited area during the entire three-hour detention. Accordingly, the officers’ actions effected a seizure of Watson, within the meaning of the Fourth Amendment.
B.
We turn to consider the issue whether Watson’s seizure and detention violated his rights under the Fourth Amendment, which protects individuals from “unreasonable searches and seizures.” U.S. Const, amend. IV. In cases involving a seizure, the standard of “reasonableness” typically is satisfied by a showing that the police had probable cause to conclude that the individual seized was involved in criminal activity. Dunaway v. New York, 442 U.S. 200, 213-14, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). This standard of probable cause constitutes “the minimum justification necessary to make the kind of intrusion involved in an arrest ‘reasonable’ under the Fourth Amendment.” Id. at 208, 99 S.Ct. 2248. As a general rule, “an official seizure of the person must be supported by probable cause, even if no formal arrest is made.” Michigan v. Summers, 452 U.S. 692, 696, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (citing Dunaway, 442 U.S. at 212-13, 99 S.Ct. 2248). The government bears the burden of demonstrating that a warrantless seizure is reasonable. See Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951).
i.
In analyzing the reasonableness of a seizure that is not supported by probable *690 cause,[6] courts are required to evaluate “the law enforcement interest and the nature of the ‘articulable facts’ supporting the detention.” See Summers, 452 U.S. at 702, 101 5.Ct. 2587. This analysis entails a balancing test because, under the Fourth Amendment, “reasonableness ‘depends on a balance between the public interest and the individual’s right to personal security free from arbitrary interference by law officers.’ ” United States v. Stanfield, 109 F.3d 976, 979 (4th Cir.1997) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)) (other citations omitted). Thus, to determine whether Watson’s seizure and continued detention were reasonable, “we [must] balance[ ] the intrusion on [Watson’s] Fourth Amendment interests against [the] promotion of legitimate governmental interests.” Maryland v. Buie, 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (citations omitted); see also United States v. Legg, 18 F.3d 240, 245 (4th Cir.1994) (citing Buie).
In the present case, the government relies on Illinois v. McArthur, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), advancing two reasons to justify the intrusion on Watson’s privacy and liberty: (1) preventing the destruction of evidence; and (2) ensuring the safety of the police officers present in the building. In conducting the balancing test required by Buie, we conclude that the cited governmental objectives, although very important as a general matter, were not implicated sufficiently in the present case to justify the significant intrusion on Watson’s Fourth Amendment rights.
We observe that the facts of this case are highly unusual, if not unique. The facts framing our analysis include the three-hour detention of an individual, whom the police encountered in a building open to the public, at a time when a search warrant had not been authorized. During the entire course of that three-hour detention, the police had no reason to believe that the detained individual was linked to any criminal activity, including the evidence sought in the search warrant application.
Our “reasonableness” inquiry is guided by principles applied in several cases, including the Supreme Court’s decisions in Summers and McArthur. We first consider the Supreme Court’s decision in Summers, which addressed the constitutionality of a seizure and detention incident to the execution of a search warrant. There, the police had obtained a search warrant for a residence before detaining for the duration of the search an occupant of the premises seen leaving the house.[7] Id. at 693, 101 S.Ct. 2587. The Court assumed that the detention was not supported by probable cause, but held that the seizure nevertheless was reasonable because the police had obtained the search warrant before the seizure occurred. Id. at 701-05, 101 S.Ct. 2587.
In its analysis, the Court stated that it was “[o]f prime importance” in assessing the legality of the defendant’s detention that “the police had obtained a warrant to search [his] house for contraband.” Id. at 701, 101 S.Ct. 2587. The Court observed that before the defendant was seized, a neutral and detached magistrate already had “authorized a substantial invasion of the privacy of the persons who resided there,” id., and, therefore, the search warrant “provide[d] an objective justification *691 for the detention.” Id. at 703, 101 S.Ct. 2587. Thus, the prior authorization of the search warrant at the time the defendant was detained was the foundation of the Summers holding.
Based on these considerations, the Court held that for purposes of the Fourth Amendment, a search warrant authorized upon a finding of probable cause “implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.”[8] Id. at 705, 101 S.Ct. 2587. The Court also left open the possibility that the seizure of a person could be lawful in the absence of a search warrant, if justified by exigent circumstances. Id. at 702 n. 17, 101 S.Ct. 2587.
The Supreme Court later confronted such a situation in McArthur. There, the Court held that police officers did not violate the Fourth Amendment when they prevented a defendant from entering his home for about two hours while the officers obtained a search warrant for the premises. 531 U.S. at 328, 121 S.Ct. 946. The officers took this action after learning from the defendant’s wife that the defendant “had dope in there,” and that she had seen him “slid[e] some dope underneath the couch.” Id. at 329, 121 S.Ct. 946.
The Supreme Court characterized the officers’ actions as a “temporary seizure.” [9] Id. at 330, 121 S.Ct. 946. The Court held that the officers’ conduct was reasonable on several grounds, including that the officers had probable cause to believe the defendant was harboring illegal narcotics in his residence, and that the officers reasonably feared the defendant would destroy the drugs unless he was restrained until after the search was completed. Id. at 332, 121 S.Ct. 946. The Court further observed, with approval, that the defendant was restrained in a significantly less restrictive manner than would have occurred in the case of an arrest, because he was prevented only from entering his residence unaccompanied. Id. at 332, 121 S.Ct. 946. Thus, the Court concluded that the officers made reasonable efforts to reconcile their law enforcement objectives with the defendant’s right to personal privacy. Id.
In our view, the holding in McArthur is inapposite to the present case for several reasons: (1) the officers did not suspect Watson of engaging in any criminal activity at the time of his detention; (2) the officers did not have any reason to believe that Watson would destroy any contraband in the building; (3) the restraint imposed on Watson was more severe, both in character and in duration, than the restraint imposed on the defendant in McArthur; and (4) the present record lacks any justification for the length of the detention that occurred in this case. We discuss these distinctions below.
Most significantly, we distinguish McAr-thur on the basis that the police there had direct evidence that drugs belonging to the defendant would be found inside his home. See id. at 329, 121 S.Ct. 946. Here, however, it is uncontested that the police did not suspect Watson of any criminal activity, and lacked any basis for connecting *692 Watson to the contraband sought in the search warrant application. Thus, although the seizure of the building may-have been supported by probable cause, the seizure of Watson himself was not so supported, in contrast to the seizure that occurred in McArthur. Cf. id. at 334, 121 S.Ct. 946. Likewise, the police had no basis to conclude that Watson might attempt to destroy or hide the evidence sought in the search warrant application.[10]
Although the Supreme Court could have done so in McArthur, the Court did not announce a bright-line rule permitting police to detain any person found on property while the officers are awaiting authorization of a search warrant for that property. Rather, the Court focused on the existence of a connection between the defendant and the contraband that was the subject of the search warrant application. See id. at 332, 121 S.Ct. 946.
We also observe that McArthur involved a restraint that was different in both character and duration from the restraint imposed on Watson. In McArthur, the defendant merely was prevented from entering his residence unaccompanied, because the police reasonably feared that he would destroy the drugs identified by his wife. The restraint imposed on Watson, however, was not so limited or tailored. Rather than removing Watson from the building and prohibiting his reentry, the police kept Watson confined inside the building the entire time that they were preparing and awaiting authorization of the search warrant.
We further note that, in considering the length of the defendant’s detention in Mc-Arthur, the Supreme Court observed that “as far as the record reveals,” the defendant’s two-hour restraint “was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.” Id. at 332-33, 121 S.Ct. 946. In contrast, the record before us lacks any evidence explaining the reason why it took the officers three hours to obtain the search warrant and return to the building.[11] Although the district court stated that “[t]he warrant was approved as quickly as possible in light of the caseload that the state judges in Baltimore need to deal with,” there is no evidence supporting this conclusion.
In sum, each of the reasons justifying the police conduct in McArthur is either absent here or weighs against a conclusion that the officers reasonably seized and detained Watson. Accordingly, the holding in McArthur fails to support the district court’s denial of Watson’s motion to suppress.
ii.
Because the holdings in Summers and McArthur do not provide support for Watson’s prolonged detention, and in the absence of any precedential cases supporting the government’s argument, we return to the “ultimate standard” embodied in the Fourth Amendment, the standard of reasonableness. See Summers, 452 U.S. at 699-700, 101 S.Ct. 2587. As we noted above, “in determining reasonableness, we [must] balance[ ] the intrusion on the individual’s Fourth Amendment interests *693 against [the] promotion of legitimate governmental objectives.” Buie, 494 U.S. at 331, 110 S.Ct. 1093.
We need not belabor the point that Watson’s three-hour detention in a confined space and under constant police surveillance was a substantial intrusion on his Fourth Amendment rights. Against this substantial intrusion, we consider the law enforcement objectives underlying the officers’ decision to detain Watson while the search warrant was obtained, namely, the need to preserve evidence and the concern for officer safety.
We do not question the proposition that these two objectives are important law enforcement goals. They are. With respect to officer safety, we observe that the protection of police officers is of particular concern in cases in which both drugs and firearms are the subject of a pending search warrant. As the Supreme Court explained in Buie, police officers need to be assured that the persons with whom they are dealing are not “armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against [the officers].” 494 U.S. at 333, 110 S.Ct. 1093 (holding that police did not need “probable cause” to conduct a “protective sweep” of a residence when executing an arrest warrant); see also United States v. Laudermilt, 677 F.3d 605, 610 (4th Cir.2012) (discussing Buie). Thus, in securing the building, it was reasonable for the officers here to locate the individuals present in the building and to bring them to a central location.
In the absence of probable cause, however, an intrusion on an individual’s Fourth Amendment rights must be “strictly circumscribed by the exigencies which justify its initiation.” Terry v. Ohio, 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For instance, as discussed in Buie, police officers may conduct a “protective sweep” of a residence without probable cause, so long as the search “extend[s] only to a cursory inspection of those spaces where a person may be found,” and “lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.” 494 U.S. at 335-36, 110 S.Ct. 1093 (emphasis added). Thus, the extent of any Fourth Amendment intrusion undertaken for purposes of officer safety must be “no more than necessary to protect the officer from harm.” Buie, 494 U.S. at 333, 110 S.Ct. 1093 (discussing Terry) (emphasis added).
We are not aware of any Supreme Court case or federal appellate decision permitting a three-hour detention of an occupant of a building who lacks any specific connection to suspected criminal activity, while police obtain a warrant to search that building.[12] Moreover, the detention that occurred in the present case lasted significantly longer than any reasonable period the officers needed to alleviate potential threats to their safety. At some point during Watson’s detention, likely close to its inception, any potential threat that Watson posed to the officers’ safety had dissipated. Thus, at that point, any reasonable justification for continuing to detain Watson dissipated as well.
This is not a case in which there was any evidence presented to the district court suggesting that the police were reasonably concerned that the release of Watson, and the owner of the store, Steele, could endanger the officers who were awaiting the *694 issuance of the search warrant. There is no evidence in the record that Watson posed any risk to officer safety, and that his continued seizure was necessary for that reason. Further, the mere supposition that Watson, if he had been removed from the building, could have alerted others concerning the police activity in the building did not provide such a justification to detain Watson. The present record lacks any evidence that Watson knew individuals who had not been detained, but were connected to the suspected criminal activity, and who could have posed a threat to the officers’ safety. Therefore, the record fails to support the need for even a brief extension of Watson’s initial detention until additional officers could be brought to the area to monitor the situation.
Accordingly, in “balancing] the intrusion on [Watson’s] Fourth Amendment interests against [the] promotion of legitimate governmental interests,” Buie, 494 U.S. at 331, 110 S.Ct. 1093, we hold that the evidence in this case weighs decisively in Watson’s favor. There simply is nothing in the record in this case suggesting that the government has met its burden of demonstrating a legitimate public interest in detaining Watson for three hours. Thus, we conclude that Watson’s three-hour detention was unreasonable and constituted an unlawful custodial arrest in violation of his Fourth Amendment rights.
iii.
We observe that our dissenting colleague would create a new rule of constitutional law allowing the police to detain citizens for a substantial amount of time, despite the absence of a search warrant or the absence of any information connecting those citizens to participation in criminal activity. In reaching this conclusion, the dissent misconstrues our holding and broadens, without foundation, the holdings of cases the dissent cites to support its view.
a.
Contrary to the dissent’s contention, our holding does not impose a requirement that after completing a Buie protective sweep, the police must have probable cause to support the continued detention of an occupant of a building while a search warrant is being obtained. Because our holding is based on the officers’ admission that the police had no information linking Watson to criminal activity in the building, we need not reach, and do not consider, the level of suspicion required to detain an individual in these circumstances.
We further observe that the Supreme Court has never accepted the view advanced by the dissent that a person’s mere proximity to a location of suspected criminal activity allows police to subject that individual to a prolonged detention in the absence of a search warrant. Contrary to the dissent’s view, a building and a person present in that building are not treated the same when conducting a Fourth Amendment analysis.
b.
The dissent’s reliance on certain cases to support its view, particularly its discussion of Summers, reflects a misreading of the holdings in those cases. The dissent discusses Summers as if the presence of a search warrant at the time of the detention was a mere afterthought in the Court’s analysis. However, as we already have stated, the presence of a search warrant was central to the Court’s decision. The Court began its analysis in Summers by stating that “[o]f prime importance in assessing the intrusion [on the defendant’s privacy and liberty] is the fact that the police had obtained a warrant to search *695 [defendant’s] house for contraband.” 452 U.S. at 701, 101 S.Ct. 2587 (emphasis added). And, as noted above, the Court emphasized that, at the time of the detention, a magistrate judge had already “authorized a substantial invasion of the privacy” of the persons residing in the place to be searched. Id.
Later in the Summers opinion, the Court reiterated the importance of the fact that the police already had obtained a search warrant at the time the resident was detained. The Court stated that “the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant”[13] Id. at 703, 101 S.Ct. 2587 (emphasis added).
Despite this unequivocal language, the dissent maintains that the holding in Summers supports a detention in the absence of a warrant. Such a conclusion, however, would render superfluous the Court’s explicit and extensive discussion of the importance of the existing search warrant in its analysis.[14]
The dissent also quotes out of context a footnote in Summers, which states that “[t]he fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant.” 452 U.S. at 702 n. 17, 101 S.Ct. 2587. In that footnote, the Court did not imply that such a detention would be permissible, but merely reserved that issue for future determination. Thus, the dissent’s reliance on this language of “possibility” as the centerpiece of its analysis is fundamentally misplaced.[15]
*696 Moreover, if the dissent’s reading of that footnote were an accurate portrayal of the law, the Supreme Court simply would have resolved the legality of the seizure at issue in McArthur on the basis that the police had probable cause to search the defendant’s mobile home. That fact, however, was but one of several reasons that the Court employed to uphold the seizure in that case. Most importantly, independent of the probable cause determination, the Supreme Court analyzed the specific facts of the case and determined that the police reasonably concluded that the defendant, who had been identified as the owner of illegal drugs stored in his home, would destroy the drugs before the officers could return with a warrant. See 531 U.S. at 382, 121 S.Ct. 946.
The dissent’s reliance on three circuit court cases fares no better than its reliance on Summers. In the first such case, United States v. Cephas, 254 F.3d 488 (4th Cir.2001), this Court held that exigent circumstances justified the police officers’ warrantless entry into the defendant’s residence. Significantly, the defendant in that case did not challenge the legality of his detention.[16] Id. at 494 (stating that the legal issue under consideration “is whether Sergeant Shapiro’s warrantless entry into Cephas’s apartment was lawful”). Thus, our decision in Cephas is inapposite here.
Similarly, in the out-of-circuit cases relied upon by the dissent, United States v. Limares, 269 F.3d 794 (7th Cir.2001), and United States v. Ruiz-Estrada, 312 F.3d 398 (8th Cir.2002), the defendants did not challenge the legality of their detention in the absence of a search warrant. Rather, the defendants in both of those cases challenged the warrantless entry that occurred. See Limares, 269 F.3d at 798 (Limares “contends that the agents violated the [Fjourth [Ajmendment by entering 2705 S. Harrison [Street] in advance of [the] warrant” being issued); Ruiz-Estrada, 312 F.3d at 404 (Ruiz-Estrada “claims the officers illegally entered the apartment absent exigent circumstances and exploited their presence inside the apartment to obtain information to use in the affidavit filed in support of a search warrant”).
We are aware of no authority, and the dissent has cited none, that supports the dissent’s suggested expansion of police power at the expense of settled Fourth Amendment principles. Although there may well be legitimate law enforcement objectives that would be furthered by allowing police to detain individuals in the posture of Watson and Steele in the absence of a warrant, those objectives must yield to the protections guaranteed by the Fourth Amendment.
C.
We next consider the issue whether Watson’s incriminating statement should be suppressed as the product of his unlawful custodial arrest. The Supreme Court long has held that an incriminating statement obtained by exploitation of an illegal arrest may not be used against a *697 criminal defendant. Brown v. Illinois, 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Wong Sun v. United States, 371 U.S. 471, 484-86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); see also Kaupp v. Texas, 538 U.S. 626, 632-33, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (per curiam) (vacating conviction on basis of admission of confession obtained as result of unlawful arrest); United States v. Seidman, 156 F.3d 542, 548-49 (4th Cir.1998) (discussing Wong Sun and Brown decisions). In evaluating the admissibility of a defendant’s statement made after an illegal arrest, the government bears the burden of establishing that the defendant’s statement was “ ‘sufficiently an act of free will to purge the primary taint.’” Brown, 422 U.S. at 602, 95 S.Ct. 2254 (quoting Wong Sun, 371 U.S. at 486, 83 S.Ct. 407).
The determination whether there was a “break” in the causal chain between an unlawful arrest and a defendant’s incriminating statement depends on the facts of each specific case. Id. In analyzing the admissibility of such a statement, we consider several factors, including: (1) the “purpose and flagrancy of the official misconduct”; (2) whether Miranda warnings were given to the defendant; (3) the “temporal proximity of the arrest and the confession”; and (4) the presence of intervening circumstances. Brown, 422 U.S. at 603-04, 95 S.Ct. 2254; see also United States v. McKinnon, 92 F.3d 244, 247 (4th Cir.1996) (discussing Brown factors).
In the present case, we first observe that although the very nature of the prolonged detention was inherently coercive, the record does not show that any flagrant police misconduct occurred. Cf. Brown, 422 U.S. at 605, 95 S.Ct. 2254 (concluding that the “impropriety of the arrest was obvious” and “had a quality of purposefulness” that was “calculated to cause surprise, fright, and confusion”). We also observe that the officers provided Miranda warnings to Watson on two separate occasions, once when he was first detained and again when Detective Jami-son returned to the building with the signed search warrant.
The issuance of Miranda warnings, however, does not automatically cure the taint of an illegal arrest. Brown, 422 U.S. at 602, 604, 95 S.Ct. 2254; see also United States v. Sanders, 954 F.2d 227, 231 (4th Cir.1992) (citing Brown). The record also must satisfy the government’s burden of showing a break in the causal chain between the defendant’s unlawful arrest and his incriminating statement. Brown, 422 U.S. at 603-04, 95 S.Ct. 2254. Here, this “temporal proximity” factor weighs strongly in Watson’s favor because he was not freed from the officers’ custody at any point between his initial seizure and the time he made his incriminating statement. Thus, in this respect, the causal connection between the illegality and the incriminating statement remained unbroken.
Additionally, the record fails to show that there were any “intervening circumstances” attenuating the illegal arrest from Watson’s statement. See id. at 603-04, 95 S.Ct. 2254. The officers restrained Watson continuously for three hours in the same location, where they later obtained his statement about the gun. In short, Watson’s statement occurred as part of an uninterrupted course of events, during which “there was no intervening event of significance whatsoever.” [17] See id. at 604, *698 95 S.Ct. 2254. Accordingly, we hold that the district court erred in denying Watson’s motion to suppress because there was no break in the causal connection between his unlawful custodial arrest and his statement, rendering the statement the product of his unlawful arrest rather than “an act of free will unaffected by the initial illegality.” See id. at 603, 95 S.Ct. 2254.
D.
Having concluded that Watson’s incriminating statement was improperly admitted into evidence, we now must address the impact of that error on Watson’s trial. See Arizona v. Fulminante, 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (concluding that harmless error analysis applies to coerced or involuntary statements); United States v. Blauvelt, 638 F.3d 281, 290 (4th Cir.2011) (applying harmless error analysis to incriminating statement made by defendant following his detention, which was assumed to be unlawful). In assessing whether a constitutional error was harmless, we determine whether the admission of the statement at issue “was harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found [the defendant] guilty absent the error.” United States v. Poole, 640 F.3d 114, 119-20 (4th Cir.2011) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
Upon our review of the record, we are unable to conclude that the admission of Watson’s statement was harmless beyond a reasonable doubt. The district court properly instructed the jury that to find Watson guilty of the offenses charged, the government was required to prove beyond a reasonable doubt that Watson “knowingly possessed” the firearm and ammunition that was found in the toiletry bag. The district court also instructed the jury regarding the government’s burden to prove that Watson possessed these items “purposefully and voluntarily, and not by accident or mistake.” Further, because the government sought to establish Watson’s constructive, rather than actual, possession of the items, the court instructed the jury that to find Watson guilty of the charges, the jury had to find beyond a reasonable doubt that Watson “had the power and intention to exercise control over either the firearm or the ammunition.”[18]
Watson’s theory at trial, as emphasized during his closing argument, was that he did not own or otherwise knowingly possess the revolver or ammunition, but rather that the bag containing those items was “stashed” in Watson’s closet by Jackson after he observed police activity near the building. The defense noted that Jackson and Watson both lived on the second floor of the building, and that Jackson had a lock on the door to his room but that Watson did not. The defense further noted that Jackson was a drug dealer known to carry firearms, and that the officers believed Jackson was carrying a firearm when he was observed earlier conducting a suspected drug transaction near the building, but that he was unarmed when arrested after leaving the building.
In contrast, the evidence presented by the government to prove that Watson knowingly possessed the firearm and ammunition was: (1) that the contraband items were found in Watson’s room, which also contained other items belonging to *699 Watson; and (2) Watson’s statement regarding the gun. There was no other evidence tending to establish that Watson owned or was aware of the firearm or ammunition found in the toiletry bag.
The fact that Watson owned the other items found in his bedroom did not mandate a conclusion that he also owned the toiletry bag containing the revolver and the ammunition. Without the evidence of Watson’s statement, the jury may have chosen to accept the defense theory that Jackson, upon seeing a police presence, “stashed” the items in Watson’s unlocked room.
The record also establishes that Watson’s statement was a focal point of the jury’s deliberations, which lasted more than nine hours. During this time, the jury submitted to the court two questions directly addressing Watson’s statement. First, the jury requested that the court read “Detective Jamison’s testimony when he showed the defendant the bag and asked about the gun.” Second, the jury asked that the court “read from the transcript of the direct examination of Det. Jamison questions pertaining to the gun— did [Det.] Jamison say the words ‘gun in your room’ in the context of presenting the bag.” (Emphasis in original). In response to this last request, the court read to the jury Detective Jamison’s testimony detailing Watson’s statement. Less than 30 minutes after being read that testimony, the jury reached its verdict finding Watson guilty.
We are unable to conclude “beyond a reasonable doubt” that “a rational fact finder would have found [Watson] guilty absent the error.” See Poole, 640 F.3d at 119-20. Three reasons support our conclusion: (1) the absence of direct evidence showing that Watson possessed the revolver and the ammunition; (2) the defense’s theory, albeit speculative and circumstantial in its own right, that Jackson planted the firearm in Watson’s room; and (3) the jury’s questions relating to Watson’s statement. Therefore, we hold that the district court’s erroneous admission of Watson’s statement cannot be deemed harmless.
III.
In sum, we conclude that Watson was seized without probable cause, and that his three-hour detention constituted an unlawful custodial arrest in violation of his Fourth Amendment rights. We further hold that the district court erred in denying Watson’s motion to suppress, because his incriminating statement was the product of his unlawful custodial arrest. Finally, we hold that the erroneous admission of Watson’s statement was not harmless. Accordingly, we vacate Watson’s convictions, and remand the case to the district court for further proceedings.

VACATED AND REMANDED.

. According to one of the officers, Jackson "exhibited characteristics of an armed person.”

. After hearing conflicting testimony regarding the length of Watson’s detention, the district court determined that Watson was detained by the officers for three hours. Watson does not argue that the district court clearly erred in making this factual finding.

. Anthony Jackson lived in the “middle room” on the second floor.

. Detective Jamison also located items of paperwork in this room that bore Watson's name.

. Watson’s firearm conviction was based solely on his possession of the revolver.

. The government concedes, and we agree, that the officers did not have probable cause to detain Watson.

. The police quickly learned that this individual was the owner of the house to be searched.

. The Court nevertheless cautioned that its holding may not be applicable in cases involving a "prolonged detention.” Id. at 705 n. 21, 101 S.Ct. 2587.

. It is unclear from the Court’s opinion whether the Court used the term "seizure” with reference to the defendant’s residence, to the defendant himself, or to both the residence and the defendant. However, this use of the term "seizure” does not need to be clarified for purposes of the present case, because the holding in McArthur is distinguishable irrespective of the focus of the Court’s reference.

. We observe that the record does not show that the police even were aware that Watson lived in the building until after Detective Ja-mison returned with the signed warrant.

. The only evidence in the record concerning the amount of time involved in Detective Jamison's efforts to obtain the search warrant are his notes reflecting that the warrant was signed at 3:34 p.m., and that he delivered the signed warrant to the officers present in the building at 3:45 p.m.

. As explained later in this opinion, the four cases cited by our colleague in dissent are inapposite.

.In a footnote, the Court expanded on the importance of a magistrate, rather than an officer on the scene, making decisions that would otherwise infringe on a citizen’s Fourth Amendment rights. Quoting from the Court’s opinion in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), the Court in Summers observed that
[t]he point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate’s disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.
Summers, 452 U.S. at 703 n. 18, 101 S.Ct. 2587 (quoting Johnson, 333 U.S. at 13-14, 68 S.Ct. 367).

. For these reasons, the dissent’s reliance on Muehler v. Mena, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005), also is not persuasive. The Court's opinion in Mushier, relying exclusively on Summers, recites the unremarkable proposition that “officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.’ ” Muehler, 544 U.S. at 98, 125 S.Ct. 1465 (quoting Summers, 452 U.S. at 705, 101 S.Ct. 2587). Applying this well-settled principle, the Court held that “Mena’s detention for the duration of the search was reasonable under Summers because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.” Id. (emphasis added). Similarly, as the dissent itself observes, the search and detention at issue in United States v. Photogrammetric Data Servs., 259 F.3d 229, 239 (4th Cir.2001), occurred after the police had obtained a warrant.

. We further observe that even if the holding in Summers is extended at a future date such that exigent circumstances, as a general mat *696 ter, could justify the prolonged detention of a suspect while a warrant is obtained, such an extension would not automatically answer the question posed in this case. In our view, it is doubtful whether the type of "exigent circumstances” referenced by the Court in Summers would encompass the detention, for a period of three hours, of persons who are not suspected of participating in criminal activity.

. Our decision in Cephas is also distinguishable on the basis that, once inside the apartment, the officers observed evidence of drug activity in plain view that was near the persons who were detained. See 254 F.3d at 491. Thus, in Cephas, in contrast to the present case, the police officers had individualized suspicion that the defendant was involved in criminal activity.

. We reject the government’s argument, offered without any supporting authority, that the officers’ discovery of the firearm and ammunition was a qualifying "intervening event” under the holding in Brown. The record does not provide any indication that, ab *698 sent the unlawful custodial arrest, Watson would have been present during the search when the officers discovered the toiletry bag and its contents.

. Neither party contends that the district court’s instructions to the jury were erroneous.