WYNN, Circuit Judge;
dissenting:
Acting on an anonymous tip, three armed and uniformed police officers drove to Defendant Ronnie Belt’s residence to investigate potential drug activity. Upon seeing his eleven-year-old son playing outside the home, the officers told the child they needed to speak with Belt. At the child’s invitation, the officers entered the home — not through the front door, as an ordinary visitor might, but through the kitchen. They did not knock on the kitchen door. Nor did they announce their presence in any way. Rather, chaperoned by the young boy, the officers walked through Belt’s kitchen and confronted him in his living room. There they immediately began questioning him about suspected drug activity. His responses to those questions enabled the officers to obtain a warrant, which led to the discovery of methamphetamine manufacturing evidence in a matter of hours.
The majority holds that Belt’s responses to the officers’ interrogatories constituted intervening acts that severed the causal connection between the officers’ illegal entry and the discovery of incriminating evidence. However, Belt’s answers to the officers questions came on the heels of their illegal entry into his home as part of an “an uninterrupted course of events.” United States v. Watson, 703 F.3d 684, 697 (4th Cir.2013). And nothing in the record warrants an inference that the officers’ discovery of the evidence was “unaffected by the initial illegality” — the officers’ illegal entry into his home. Id. at 698. Thus, I cannot agree with the majority’s decision to affirm the district court’s denial of Belt’s motion to suppress on this basis.
Because no intervening acts severed the causal connection between the officers’ entry and the discovery of the evidence Belt sought to exclude, the constitutional question in this case is squarely before us. Addressing this question leads to the conclusion the officers’ entry into Belt’s home violated the Fourth Amendment. No reasonable officer would believe that Belt’s eleven-year-old child had authority to consent to the officers’ entry into Belt’s home, nor does the record establish that the child had actual authority to give such consent.
I.
The majority holds that Belt’s motion to suppress was properly denied because the *752 officers’ discovery of evidence was too attenuated from their entry, which the majority assumes was illegal. I disagree because the officers’ discovery of evidence was part of an “an uninterrupted course of events” arising from their illegal entry. Id.
Evidence discovered as a result of a Fourth Amendment violation is generally subject to suppression under the exclusionary rule. United States v. Andrews, 577 F.3d 231, 235 (4th Cir.2009). The exclusionary rule is a prudential doctrine meant to “compel respect” for the freedoms guaranteed by the Fourth Amendment. Davis v. United States, — U.S.-, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (internal quotation marks and citation omitted). By excluding evidence discovered by way of a Fourth Amendment violation, the rule “safeguard[s] against future violations of Fourth Amendment rights through [its] general deterrent effect.” Arizona v. Evans, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).
The rule is not without its exceptions, however. Indeed, evidence derived from an illegal search may be admissible where the evidence was not come at “ ‘by exploitation of that illegality’ ” but instead “ ‘by means sufficiently distinguishable to be purged of the primary taint.’ ” United States v. Gaines, 668 F.3d 170, 173 (4th Cir.2012) (quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Thus “where there is sufficient attenuation between the unlawful search and the acquisition of evidence, the ‘taint’ of that unlawful search is purged.” Id.
The Supreme Court has prescribed three factors for determining whether the taint from a Fourth Amendment violation had dissipated: “(1) the time between the Fourth Amendment violation and the [acquisition of evidence], (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct.” United States v. Hill, 649 F.3d 258, 267 (4th Cir. 2011) (citing Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).
A.
The majority concludes, and I agree, that the first Brown factor quite clearly cuts in favor of suppression. Very little time passed between the officers’ illegal entry into Belt’s residence and their successful attempt to elicit incriminating statements regarding drug activity in his home. Within two hours, a warrant had been issued and the evidence of methamphetamine manufacturing obtained from Belt’s home.
B.
But I part ways with the majority in its application of the second Brown factor— the presence of intervening circumstances sufficient to break the causal chain between the Fourth Amendment violation and the discovery of evidence. The majority relies in large part on this Court’s ruling in United States v. Seidman, 156 F.3d 542 (4th Cir.1998).
In Seidman, after an informant acting as a government agent illegally entered the defendant’s home, the informant was greeted by the defendant, who explained that he had not answered the door because he had been in the basement. The defendant then closed the door behind the informant, waived him into his kitchen, and carried on a forty-five minute conversation with him “regarding their families, personal lives, Union business, and the [informant’s] tax dilemma.” Id. In a divided opinion, this Court held that the taint of the informant’s illegal entry had been purged by “the intervening independent *753 acts of Seidman shutting the door behind [the informant], motioning [the informant] into his kitchen, and engaging [the informant] in conversation for a substantial period of time.” Id. at 550.
Seidman is manifestly distinguishable from this case. Belt did not welcome the officers into his kitchen. He did not shut the door behind them. He did not waive the officers into his living room. Nor did he willingly engage them in lengthy conversation. The officers walked through his kitchen and appeared suddenly and without warning in his living room. They asked questions; he answered them. Nothing suggests that Belt would have engaged the officers in conversation but for their illegal entry into his home. The officers’ illegal entry was thus part of an unbroken chain of events leading to the discovery of evidence.
With great respect to my colleagues, I must express my belief that the majority is truly grasping at straws when it suggests that the facts of this case “sufficient[ly]” align with Seidman because Belt “did not ask the troopers to leave.”' Ante at 749. In Seidman, the defendant’s actions made it abundantly clear that he would have welcomed the government informant into his home even if the informant had not let himself in — indeed, the defendant stated that the only reason he did not open the door was because he had been in the basement. Seidman, 156 F.3d at 549. Thus, the defendant’s decision to speak to the informant was clearly unaffected by the informant’s unlawful entry. The government, which bears the burden of proving that the taint of their unlawful entry had dissipated, id. at 548, has presented no analogous evidence whatsoever in this case.
To read the majority opinion, which repeatedly uses verbiage such as “willing[ ]” and “consensual” to describe Belt’s conversation with the police officers, one would think our task here was to determine whether Belt’s statements were voluntary under the Fifth Amendment. However, “[t]his Court and the Supreme Court' have consistently held that an analysis of the voluntariness of a statement is a separate inquiry from determining whether the taint from a Fourth Amendment violation has dissipated.” Hill, 649 F.3d at 269 (citing Taylor v. Alabama, 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (“[T]his Court [has] firmly established that the fact that a confession may be ‘voluntary’ for purposes of the Fifth Amendment ... is not by itself sufficient to purge the taint of an illegal arrest.”)). The appropriate inquiry is not whether Belt was physically or otherwise coerced into making incriminating statements. Rather, we must look to whether Belt’s statements constituted intervening acts that severed the causal connection between the officers’ unconstitutional entry into the home and the discovery of evidence.
Further, particularly when viewed in the context of our precedent, Seidman does not stand for the proposition that voluntary incriminating acts or statements by a defendant necessarily purge the taint of a constitutional violation. In United States v. Gooding, for example, police officers illegally stopped the defendant at a bus stop, suspecting him of carrying drugs. 695 F.2d 78, 84 (4th Cir.1982). Moments later, the officers requested permission to search his briefcase and flight bag. The defendant opened his briefcase and bag, and actively handed items to the police officers. We held that the defendánt’s voluntary decision to facilitate the officer’s search did not constitute intervening circumstances sufficient to purge the taint of the illegal stop. Id.
Indeed, the Supreme Court itself has found intervening circumstances only *754 where the defendant had the opportunity “to consider carefully and objectively his options and to exercise his free will.” Taylor, 457 U.S. at 691, 102 S.Ct. 2664. The Supreme Court has therefore found intervening circumstances to have occurred where the defendant appeared at a hearing before a magistrate judge and was advised of his rights, see Johnson v. Louisiana, 406 U.S. 356, 365, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), or was arraigned and released from custody for six-days before making incriminating statements, see Wong Sun, 371 U.S. at 491, 83 S.Ct. 407. Under such circumstances, the causal chain between the initial illegality and the defendant’s statements is clearly broken. Brown, 422 U.S. at 602, 95 S.Ct. 2254.
Here, by contrast, Belt’s answers to the officers’ questions came after their sudden appearance in his home, on the heels of their illegal entry, and were thus part of an “an uninterrupted course of events.” Watson, 703 F.3d at 697. The government has not established that their subsequent discovery of the evidence was “unaffected by the initial illegality.” Id. at 698.[1]
Given the absence of intervening circumstances, this Brown factor weighs in favor of suppression.
C.
The third Brown factor — the flagrancy of the official misconduct — presents a somewhat mixed picture. As the majority notes, the officers’ conduct in this case certainly pales in comparison to the egregious misconduct present in some Supreme Court cases. See ante at 749-50 (collecting cases). On the other hand, we recently held that “flagrancy” within the context of a Fourth Amendment violation is more likely to exist when the police misconduct “involves ‘the physical entry of the home, which is the chief evil against which the wording of the Fourth Amendment is directed.’ ” Hill, 649 F.3d at 270 (quoting Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
The Supreme Court has also directed courts to look to the “quality of purposefulness” of the Fourth Amendment violation to determine whether the taint of that violation is attenuated. Brown, 422 U.S. at 605, 95 S.Ct. 2254. The officers in this case purported to rely upon the consent of Belt’s eleven-year-old son to gain entry into his home. Upon learning that Belt was home, the officers could easily have knocked on his door, identified themselves, and sought Belt’s consent before entering. They chose not to do so. Nor did they ask Belt’s son to retrieve his father from the home. These alternatives would have avoided not only violating Belt’s Fourth Amendment rights but also the oft-cited safety risks involved when officers confront individuals in their homes without warning. Cf. United States v. Dunnock, 295 F.3d 431, 434 (4th Cir.2002) (recognizing that the knock and announce rule “(1) protects] the safety of occupants of a dwelling and the police by reducing violence; (2) prevents] the destruction of property; and (3) protectfs] the privacy of occupants.”). Instead, the officers, fully aware that they had not obtained a warrant to search Belt’s home, exploited Belt’s minor son to gain entrance into the home. This enabled them to conduct a plain view search of the interior and to question Belt in his living room on their own terms.
Taking the Brown factors together, it must be concluded that the taint from the officers’ illegal entry had not dissipated *755 and that the district court thus erred in admitting the challenged evidence on that basis.
II.
Having determined that no intervening circumstances existed, there remains to be addressed what ought to be the central issue in this case — whether the officers’ entry into Belt’s home on the supposed authority of an eleven-year-old child violated the Fourth Amendment to the United States Constitution.
A.
Although the Fourth Amendment generally prohibits warrantless searches, see Maryland v. Dyson, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442, (1999), a valid consent to search a residence provides an exception to the usual warrant requirement, see Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Where the defendant moves to suppress the fruits of a warrantless search, the government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent. United States v. Buckner, 473 F.3d 551, 554 (4th Cir.2007).
It is well-established that consent to search may be obtained from a third party. However, two criteria must be met for such a consent to be effective. First, the third party must have authority to consent to the search. Trulock v. Freeh, 275 F.3d 391, 402-03 (4th Cir.2001) (citing Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)). Second, “the third party’s consent must be voluntary.” Id. at 403 (citing Bumper v. N. Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968)).
In United States v. Matlock the Supreme Court held that a third party has actual authority to consent to a search when the third party possesses “common authority over or other sufficient relationship to the premises ... sought to be inspected.” 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The Court explained:
The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
Id. at 172 n. 7, 94 S.Ct. 988 (emphasis-added). Thus, a co-tenant will generally have authority to consent to police searches to the co-tenant’s own private rooms or of common areas in the home when other co-tenants are absent or do not object.
Even where the consenting third party lacks “actual authority” to consent, a third party may nonetheless have “apparent authority” if “the facts available to the officer at the moment warrant a person of reasonable caution [to believe] that the consenting party had authority” to consent to the search. Buckner, 473 F.3d at 555 (alterations and quotation marks omitted). Thus, under the apparent authority doctrine, the Fourth Amendment is not violated when officers reasonably, although erroneously, believe that the person who consents to their entry has the authority to do so. Illinois v. Rodriguez, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).
B.
No Supreme Court case has addressed whether or to what extent the Matlock test *756 applies to minor children who consent to entry into or searches of a parent’s home. Nor has this Circuit addressed this issue. Some of our sister circuits, however, have, and in doing so applied the Matlock test in child-consent cases with little to no regard for the special dynamic that such cases present, as though children could be the gatekeepers of their parents’ Fourth Amendment rights.
In Lenz v. Winburn, the Eleventh Circuit considered whether a nine-year-old child had authority to consent to her guardian ad litem’s entry into their grandparent’s home. 51 F.3d 1540 (11th Cir. 1995). The court concluded that the child’s age was irrelevant under Matlock. The court reasoned that “the third-party consent rule recognizes that sharing space with another lessens the expectation of privacy in that space,” and that “[t]his compromise of the expectation of privacy is no less the case for a minor co-occupant than for an adult.” Id. at 1543.
In United States v. Clutter, the Sixth Circuit held that a search of a residence conducted with the consent of a defendant’s fourteen-, twelve-, and ten-year-old children was valid. 914 F.2d 775 (6th Cir. 1990). The court found that where, the children routinely were left in exclusive control of the house, “the government satisfied its burden of demonstrating that the initial warrantless search of the bedroom was by consent, since the boys enjoyed that degree of access and control over the house that afforded them the right to permit inspection of any room in the house,” and the defendants assumed that risk. Id. at 778.
In United States v. Gutierrez-Hemiosillo, the Tenth Circuit held that a warrant-less search by the police following their admission into the defendant’s motel room by his fourteen-year-old daughter was valid. 142 F.3d 1225 (10th Cir.1998). Analyzing the case through the lens of “apparent authority,” the court concluded that the officers could have reasonably believed that the daughter had the authority to allow them to enter the motel room where she appeared to be fourteen years old, she answered the door, and the officers knew that she was traveling with her father. These facts, the court stated, were sufficient to establish the officers’ reasonable belief that the daughter had “mutual use” of the motel room and that the defendant “assumed the risk” that she would permit the officers to enter. Id. at 1231. Applying similar reasoning, the Tenth Circuit recently held in United States v. Sanchez that the defendant’s fifteen-year-old daughter, who “was home babysitting her younger brother, a task she regularly performed alone,” and who thus was “routinely ... in charge of the family’s house,” could consent to probation officers’ plain-view inspections of the premises. 608 F.3d 685, 689-90 (10th Cir.2010).
C.
Some lower federal courts and state courts have been less willing to apply such third-party consent reasoning blindly to cases involving minors.
For instance, in Abdella v. O’Toole, officers knocked on the door of the defendant’s residence and were greeted by an eleven-year-old child. 343 F.Supp.2d 129, 134 (D.Conn.2004). When the officers asked if they could search the upstairs of the home, the child responded by saying, “I don’t care.” Id. The court assumed arguendo that the statement was tantamount to consent to search and thus analyzed whether the child had authority to grant consent. In framing the Matlock test, the court stated that “the threshold inquiry in finding the,common authority necessary for actual third-party authority to consent to a warrantless search of prop *757 erty is whether the owner, co-owner or co-inhabitant of the property has assumed the risk that the third-party will permit the property to be searched.” Id. at 135. The court concluded that “[tjhere is no basis, on the facts presented here, to conclude that the [parents] assumed the risk that their eleven-year old daughter would permit the police to search their home or personal property.” Id.
The Abdella court was highly critical of Lenz, rejecting the Eleventh Circuit’s assumption that minors have authority to consent to searches of their parents’ homes based merely on their shared access to common areas:
It is not reasonable or realistic to assume that an eleven-year old child, home alone, has always been authorized to act as an independent co-tenant, such that the parents should be on notice that their expectation of privacy is compromised. The factual record must show some clear sign that the child had responsibility for the home and the property the police desired to search.
Id. at 136-37.
Similarly, in United States v. Barkovitz, a district court held that a twelve-year-old child lacked actual or apparent authority to consent to a search of his father’s bedroom. 29 F.Supp.2d 411, 413-16 (E.D.Mich.1998). In Barkovitz, officers responded to a “shots fired” call placed by the defendant’s neighbor. Id. at 412. When the officers arrived, they noticed a twelve-year-old boy standing on the porch of the defendant’s home. The officer’s asked the child “Where is the gun?,” and the child walked the officers into the home and into his father’s bedroom, where his father’s gun was kept. Id. The court distinguished the Sixth Circuit’s decision in Clutter, noting that there was no evidence that the twelve-year-old was “regularly left alone.” Id. at 414. The court concluded, “[t]he government failed to show that [the child] had the actual authority to allow anyone in the house, much less his father’s bedroom.” Id.
Some state courts have been less willing to find that a child’s access to a shared family space imbues the child with actual or apparent authority to allow visitors into the home. Most notably, in People v. Jacobs, 43 Cal.3d 472, 233 Cal.Rptr. 323, 729 P.2d 757 (1987), police officers went to the defendant’s house and asked his eleven-year-old stepdaughter, who answered the door, if the defendant was home. Id. at 475-77, 233 Cal.Rptr. 323, 729 P.2d 757. The child, who was babysitting her younger siblings at the time, admitted the officers into the “front room” of the residence and told the officers that the defendant would be home in one hour. Id. The officers asked for a quick tour of the house to confirm the defendant’s absence. The child accompanied the officers through the rooms of the house. On the way out, the officers noticed in plain view a television set matching the description of one that had been stolen. The officers seized the set as contraband, and the defendant was later arrested.
In applying the Matlock test, the California Supreme Court noted that the consent given by minor children must be analyzed in light of the disparate levels of authority possessed by parent and child: “Minor children ... do not have coequal dominion over the family home. Although parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given.” Id. at 482, 233 CaLRptr. 323, 729 P.2d 757. The court stated that “a child cannot waive the privacy rights of her parents” and that the evidence “viewed most favorably to the prosecution, does not support a finding *758 that [the child] had the actual or apparent authority to permit even a superficial survey of the rooms of the house.” Id. Rather than establish a per' se rule against searches based on a minor’s consent, the court recognized that “as a child advances in age she acquires greater discretion to admit visitors on her own authority.” Id. at 483, 233 Cal.Rptr. 323, 729 P.2d 757. The California Supreme Court also noted that exceptions can allow a minor to consent to, for example, “searches made at the request of a child or when a child is the victim of or a -witness to a crime.” Id.
D.
While the United States Supreme Court has yet to address whether or to what extent the Matlock test applies to minor children, the Court recently made clear that for purposes of analyzing consent under the Fourth Amendment, the relationship between a parent and a child must be treated differently from that of co-tenants with equal authority over common premises.
In Georgia v. Randolph, the Supreme Court considered whether third-party consent is valid when another co-occupant who is physically present at the scene refuses to consent. 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). The Court concluded that “it is.fair to say that a caller standing at the door of shared premises would have no confidence that one occupant’s invitation was' a sufficiently good reason to enter when a fellow tenant stood there saying, ‘stay out.’” Id. at 113, 126 S.Ct. 1515. A reasonable visitor would assume that the a resolution must be reached between the co-occupants “through voluntary accommodation, not by appeals to authority.” Id. at 114, 126 S.Ct. 1515.
On the other hand, the Court said that the Fourth Amendment calculus changes when the relationship between co-oecu-pants is hierarchical in nature, such as that between “parent and child.” Id. Common sense dictates that one would not expect that an eleven-year-old child could override the valid consent given by a parent to the search of a common area of the home by raising his or her own objection. The simple fact that a child has joint access to that area of the home does not imbue the child with authority to prevent officers from searching that area when a parent has authorized such a search. This alone suggests that a child fundamentally lacks “joint access or control” even over the common areas of the home within the meaning of Matlock.
A close examination of the principles that underlie the Matlock decision reveals that the mere notion of “joint access” cannot control the outcome in cases such as this one. Indeed, Matlock turned on the premise that when a co-occupant has “joint access or control” over property “for most purposes,” it becomes “reasonable to recognize [the co-occupant] has the right to permit the inspection in his own right.” 415 U.S. at 172 n. 7, 94 S.Ct. 988. This premise breaks down when applied to minor children. As Judge Lucero explained in his separate concurring opinion in Sanchez: [2]
The common understanding of an adult co-occupant’s authority stands in stark contrast to that of a child. Although we would expect a roommate to be free to invite whatever guests she chooses into the shared home, we cannot apply that *759 presumption for most minor children. That is, one normally assumes that a minor child is not allowed to invite guests into the home absent a parent’s approval.
Sanchez, 608 F.3d at 694 (Lucero, concurring). Indeed, “[cjhildren do not generally possess authority to permit guests simply because they have joint access to the family home.” Id. at 696. Put simply, “[a] child is not a roommate.” Id. at 692. Thus, “the default assumption when a minor answers the door should be that the child lacks authority to consent to a home search.” Id. 697-98.
Nor can the Eleventh Circuit’s age-blind reasoning in Lenz withstand a close reading of Matlock. In Lenz, the Eleventh Circuit viewed the right of a co-occupant to consent to the search of a shared space solely through the lens of “assumption of risk.” Yet, in myopically focusing on assumption risk, the court ignored the'Second and equally significant rationale underlying the Matlock decision. Matlock emphasized that the authority of the co-occupant must be such that he or she has may permit the entry of a visitor “in his own right.” 415 U.S. 164, 172 n. 7, 94 S.Ct. 988 (emphasis added). Yet, a child’s rights to come and go within any area of the home exists at the discretion of his or her parent. Thus, it makes little sense to say that because a child is permitted access to the common areas of a home that the child has authority to grant visitor’s access “in his own right.” Id. As the California Supreme Court put it:
It does not startle us that a parent’s consent to a search of the living room in the absence of his minor child is given effect; but we should not allow the police to rely on the consent of the child to bind the parent. The common sense of the matter is that the ... parent has not surrendered his privacy of place in the living room to the discretion of the ... child.
Jacobs, 233 Cal.Rptr. 323, 729 P.2d at 763 (quoting Lloyd L. Weinrab, Generalities of the Fourth Amendment, 42 U. Chi. L.Rev. 47 (1974)). Reasoning to the contrary would lead to the startling and absurd conclusion that Judge Lucero so fervently cautioned against: that “a parent surrenders a portion of her Fourth Amendment rights simply by bearing and raising a child.” Sanchez, 608 F.3d at 696.
I would hold that, absent evidence establishing that a child has been given the authority “to permit the inspection [of his parents home] in his own right,” Matlock, 415 U.S. at 172 n. 7, 94 S.Ct. 988, the government cannot meet its burden in establishing the elements of valid consent under the Fourth Amendment.[3] The mere fact that a child answers the door or has been left home alone will be insufficient.
E.
Turning to the undisputed facts of this case, even drawing all inferences in the government’s favor, there can be no question that Belt’s son lacked actual or apparent authority to grant the officers entry into Belt’s home.
The officers approached Belt’s residence on an anonymous tip regarding drug activity. The officers encountered a child between the ages of ten and twelve playing outside the home. They learned that this young boy was Belt’s son. They learned that Belt was inside the home. The fact-gathering ended there. On this information alone, the officers determined that this child had the authority to admit visitors through a side door into the home, *760 through the kitchen, and into the living room.
That Belt did not chastise his son in front of the officers for letting them in or immediately order the officers to leave tells us very little, if anything, regarding the reasonableness of their conduct. The officers did not ask Belt whether they had permission to be in his home, and we may not imply consent based on Belt’s silence alone. See generally Wayne R. LaFave, 4 SEARCH AND SEIZURE: A TREATISE On THE Fourth Amendment § 8.2(b), at 61 (4th ed. 2004) (“[F]or constitutional purposes nonresistance may not be equated with consent.”).
The officers could have asked Belt’s son to retrieve Belt from the residence. They could have knocked on Belt’s front door as an ordinary visitor might and sought to engage Belt in conversation. They did not. Instead, they relied upon the “consent” of Belt’s minor child to gain entry into his home, where they then sought to gain incriminating evidence from Belt. In doing so, they violated his Fourth Amendment rights.
III.
The officers’ illegal entry into Belt’s home led to the discovery of evidence under circumstances that warrant application of the exclusionary rule. Because, in my view, the district court erred in denying Belt’s motion to suppress and should be reversed, I respectfully dissent.

. It should go without saying that refusing to speak with uniformed, armed police officers who suddenly appear in one’s living room is an altogether different prospect than declining to do so when they stand outside one’s door as a normal visitor would.

. While Judge Lucero recognized that the Tenth Circuit’s reasoning in Gutierrez-Henno-sillo necessitated the outcome reached by the majority, he wrote separately to express his "dismay” with the court's application of "third-party consent principles designed for adult relationships to relationships involving children.” Id. at 692.

. Like other courts to who have reached similar conclusions, I would recognize exceptions where, for instance, the child's own welfare is at risk.