<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4160**

UNITED STATES OF AMERICA,

             Plaintiff – Appellee,

      v.

RONNIE GERALD BELT,

             Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.   John Preston Bailey, Chief District Judge.  (2:13-cr-00030-JPB-JSK-1)

Argued:  January 29, 2015          Decided:  April 28, 2015

Before DUNCAN, WYNN, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.  Judge Wynn wrote a dissenting opinion.

**ARGUED:** Brian Joseph Kornbrath, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant.   Stephen Donald Warner, OFFICE OF THE UNITED STATES ATTORNEY, Elkins, West Virginia, for Appellee.  **ON BRIEF:** William J. Ihlenfeld, II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ronnie Gerald Belt ("Appellant") claims West Virginia State Police troopers ran afoul of the Fourth Amendment when they entered his home at the invitation of his eleven-year-old son. Following this entry, Appellant provided the troopers information they then used to obtain a search warrant. The search revealed various items, including items used for manufacturing methamphetamine. As a result, Appellant was charged with possession of material used in the manufacture of methamphetamine and maintaining a drug involved premises in violation of 21 U.S.C. §§ 843 and 856, respectively.

Asserting the evidence seized from his home and the statements he made to the troopers were fruits of the unconstitutional entry of his home, Appellant moved to suppress both. The district court denied the motion to suppress, concluding that the troopers' entry did not offend the Fourth Amendment.

We affirm the district court's denial of Appellant's motion to suppress. In doing so, we assume the troopers violated the Fourth Amendment when they entered Appellant's home but hold that Appellant's statements were sufficiently attenuated from the constitutional violation such that suppression is not warranted.

2

I.

The facts underlying this appeal are undisputed. In early April 2013, West Virginia State Police Sergeant Gerald D. Dornburg received a phone call from an unidentified woman. This anonymous tipster told Sergeant Dornburg that methamphetamine was being produced or used at Appellant's home and that a child was present in the home. In response, Sergeant Dornburg contacted Troopers Steven Blake and S.C. Baier. The three troopers intended to travel to Appellant's home and conduct a "knock and talk," hoping to find Appellant at home and to engage him in conversation regarding the information provided by the tipster.[1] J.A. 35.[2]

When the trio of troopers arrived at Appellant's home, they noticed a young boy outside near a four-wheeler off to the side of the home. Sergeant Dornburg estimated that the boy appeared to be ten to twelve years old. The troopers, all of whom were in uniform, approached the home. One of the troopers asked the boy whether the home was Appellant's; the boy replied

---

[1] Prior to going to Appellant's home, the troopers obtained Appellant's criminal history. Appellant was, among other things, previously convicted for making illegal purchases of ephedrine or a like substance. Ephedrine is a chemical that can be used to produce methamphetamine. See, e.g., Zhenli Ye Gon v. Holder, 992 F. Supp. 2d 637, 658 (W.D. Va. 2014).

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

that it was and that he was Appellant's son.  The boy then told the troopers that his father was inside and proceeded to invite the troopers into the home through the side door connected to the kitchen.  The troopers followed the boy into Appellant's home.

Once inside the home, Sergeant Dornburg waited alone in the kitchen while Troopers Blake and Baier went to speak with Appellant.  The two troopers, led by the boy, found Appellant in the living room of his home.  Once there, they informed Appellant about the anonymous call received earlier in the day.  Then one of the troopers asked Appellant if he would consent to a search of the home.  He refused to consent and informed the troopers they were going to need a warrant.  In response, one of the troopers asked Appellant, "What are you worried about?  What are you concerned with?"  J.A. 48.  Appellant replied that there were "two jars upstairs that had been used for something."  Id. Appellant explained that the jars contained "[t]hat stuff that everybody's making."  Id. at 49.

Considering the anonymous tipster's information and Appellant's statements and criminal history, the troopers believed Appellant was referring to methamphetamine.  With that, the troopers secured the home.  Trooper Blake left to secure a warrant; Sergeant Dornburg, Trooper Baier, Appellant, and the boy stayed behind in Appellant's kitchen.

4

Based on the information provided by Trooper Blake, the magistrate court issued a search warrant. The resulting search of Appellant's home turned up firearms and various items used in the shake-and-bake method of manufacturing methamphetamine. The troopers arrested Appellant, who was subsequently charged with possession of material used in the manufacture of methamphetamine and maintaining a drug involved premises in violation of 21 U.S.C. §§ 843 and 856, respectively.

Appellant moved to suppress the evidence seized from his home and the statements he made to the troopers for several reasons. Among these reasons and pertinent on appeal, Appellant claimed the evidence and statements were tainted by the initial unconstitutional entry of his home. The initial entry was unconstitutional, Appellant argued, because his son did not have apparent authority to consent to the troopers' entry of the home.

The district court disagreed and found apparent authority existed under the circumstances. The district court also noted that, even if the troopers violated the Fourth Amendment, "the initial entry into the home [was] far too attenuated to the ultimate discovery of the evidence." J.A. 111. Accordingly, the district court denied Appellant's motion to suppress.

Thereafter, Appellant pled guilty to possession of material used in the manufacture of methamphetamine. However, he reserved his right to appeal the district court's denial of his motion to suppress. The district court entered its judgment on February 21, 2014. Appellant timely appealed.

II.

Our review of the district court's ruling on Appellant's motion to suppress is twofold. We review the district court's conclusions of law de novo; we review the district court's factual findings for clear error. See United States v. Buckner, 473 F.3d 551, 553 (4th Cir. 2007).

III.

Appellant argues that the troopers violated the Fourth Amendment by entering his home. He contends that the troopers could not reasonably believe the boy had authority to invite them into the home. Accordingly, Appellant asserts his statements to the troopers, which were used to secure a warrant and led to the discovery of incriminating evidence, were tainted by the Fourth Amendment violation; therefore, the statements and physical evidence should be suppressed.

Appellant asks us to define the contours of third-party consent and to decide when government agents can reasonably conclude that a minor has the apparent authority to extend an invitation to enter a home. We do not need to reach

6

this issue, however, because this case presents a more narrow ground on which we can affirm the district court's denial of Appellant's motion to suppress. The attenuation doctrine compels the outcome of this case.

Although evidence obtained as a result of an unconstitutional search is suppressed under most circumstances, the attenuation doctrine allows us to assume a constitutional violation occurred and decide instead whether an intervening act dispelled the taint of the violation. See United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998) ("[A]n intervening 'act of free will [may] purge the primary taint of the unlawful invasion.'" (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963))). If the taint of the violation is dispelled, suppression is not available. The Government bears the burden of establishing admissibility. See id. Our analysis of whether an act is sufficiently intervening focuses on "(1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." Id. Our analysis is guided by a "careful sifting of the unique facts and circumstances of the case." Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973)) (internal quotation marks omitted).

A.

Assuming the troopers ran afoul of the Fourth Amendment and upon review of the circumstances of this case, we conclude the taint of any Fourth Amendment violation was dispelled. Accordingly, Appellant's statements and the physical evidence seized form Appellant's home are not subject to suppression.

1.

Time -- the first Seidman factor -- is not on the Government's side. Upon entering the home, Appellant's son led Troopers Blake and Baier directly to his father. And upon finding Appellant, Troopers Blake and Baier began their conversation with Appellant. Little time passed between when the troopers entered Appellant's home and when they found and spoke with Appellant. However, a single factor weighing against attenuation does not end our inquiry. See, e.g., Seidman, 156 F.3d at 549 (noting this inquiry "does not require that each of the factors set forth be resolved in favor of the Government" (internal quotation marks omitted)).

2.

Intervening circumstances -- the second Seidman factor -- weighs in favor of finding the statements were attenuated from the entry of the home. The circumstances here are similar to those in Seidman, where this factor weighed in

8

favor of a finding of attenuation. In Seidman, "[a]lmost immediately after [the government agent] entered the home, any taint arising from [his] entry was attenuated by [appellant's] consent to the conversation." 156 F.3d at 549. The same is true here. Rather than asking the troopers to leave, Appellant willingly engaged in a conversation with the officers about the jars upstairs in his house that contained "[t]hat stuff that everybody's making." J.A. 49.

The differences between this case and Seidman do not make Seidman -- as the dissent puts it -- "manifestly distinguishable." The factual fit between this case and Seidman may not be exact, but it is sufficient. Appellant did not close the door behind the troopers and motion for them to join him as had Seidman. Importantly, however, he did not ask the troopers to leave when they arrived in his living room. Instead, after reminding the troopers they would need a warrant to search the house, Appellant continued to converse with the troopers, willingly engaging in the conversation. The consensual conversation with the troopers, the willingness to engage the troopers -- an independent act of free will -- severed Appellant's statements from the troopers' initial entry into the home. And thus any taint that may have existed was dispelled.

9

3.

Purpose and flagrancy -- constituting the third Seidman factor -- also weigh in favor of finding the statements were attenuated from the entry of the home. The troopers did not act with a flagrant disregard of the law. Cf. Brown v. Illinois, 422 U.S. 590, 593 (1975) (officers broke into apartment and held individual at gunpoint); Wong Sun, 371 U.S. at 474 (officers broke open a door and placed individual under arrest and in handcuffs); see also Seidman, 156 F.3d at 550 (discussing Wong Sun and Brown in the context of this factor).

Although we certainly question the choice to simply follow Appellant's eleven-year-old son into the home, this choice does not rise to a flagrant disregard of the law. Nothing indicates the troopers acted with an improper purpose. The troopers intended to conduct a "knock and talk" until Appellant's son invited them into the home, and after Appellant refused to permit the troopers to search his home, one trooper merely asked what worried Appellant. Appellant could have refused to answer this question. The fact that Appellant felt comfortable refusing consent to search the home reflects an absence of intimidation in this scenario. And although the troopers asked a few questions after being denied access to search the home, the voluntary nature of the discussion between Appellant and the troopers did not change. The circumstances

10

here are not as extreme as those presented in Wong Sun and Brown; just as in Seidman, "[t]he degree of coercion resulting from the police officers' illegal acts in Wong Sun and Brown . . . simply was not present here." Seidman, 156 F.3d at 550.

Discussing the purpose and flagrancy of the troopers' actions, the dissent focuses on what the troopers could have done under the circumstances. To be sure, the troopers' conduct here leaves much to be desired. But this is not the focus of our inquiry, despite our belief that the troopers should have proceeded with greater caution and respect for Appellant's privacy. The dissent offers reasonable alternatives -- advice troopers should heed in the future -- but nothing here suggests that the troopers here intimidated or coerced Appellant. In fact, Appellant conceded as much at oral argument.[3] Under these circumstances, this factor weighs against suppression.

Considering all of these factors, we conclude that the district court did not err by finding Appellant's statements were attenuated from the entry of his home. There may have been little time between the entry of the home and the conversation between Appellant and the troopers, but the circumstances here

---

[3] "We can't argue that it wasn't a voluntary process. [The troopers] didn't berate [Appellant], they didn't coerce anything out of him." Oral Argument at 6:09, United States v. Belt, No. 14-4160, available at http://coop.ca4.uscourts.gov/ OAarchive/mp3/14-4160-20150129.mp3.

11

and the actions of the troopers do not reveal any perniciousness. If the entry of Appellant's home was poisonous, Appellant provided the antidote when he engaged the troopers in conversation.

                                B.

Although we do not decide whether the troopers violated the Fourth Amendment, we digress to express our concern with the actions of the troopers in this case. On brief and at argument, the Government was unwavering in its support of the district court's conclusion that the troopers could rely on the apparent authority of Appellant's eleven-year-old son when they followed the boy into the home.

Limited information should limit the actions of government agents. When the apparent authority of a minor is at issue, the touchstone of the apparent authority inquiry is whether a reasonable person would believe the child could invite others into the home. Cf. United States v. Cazun, 62 F. App'x 441, 442 (4th Cir. 2003) (concluding apparent authority turns on "whether the facts available . . . at the time would justify a reasonable person to believe the consenting party had authority to allow entry"). The troopers in this case had very little information; they only knew the young boy they encountered outside was Appellant's son and that they were at Appellant's home.

12

But our cause for concern does not end with the limited information available to the troopers. Before inviting the troopers into the home, Appellant's son told them his father was inside. Upon encountering a child who is standing outside a home and who says a parent is inside, any reasonable person whose purpose was to speak with the adult of the house would not simply barge into the home. For this trio of troopers, however, these facts were no reason to hesitate. To the contrary, they simply took this fortuitous set of circumstances as an open invitation to enter the home. We are inclined to believe a reasonable officer, knowing the stranger he has come to visit is home, would ask the stranger's child to fetch the parent, waiting to enter until an adult extended an invitation.

## IV.

We conclude that the district court properly denied Appellant's motion to suppress because the statements he made to the troopers were attenuated from the presumed unconstitutional entry of his home.

<u>AFFIRMED</u>

13

WYNN, Circuit Judge, dissenting:

Acting on an anonymous tip, three armed and uniformed police officers drove to Defendant Ronnie Belt's residence to investigate potential drug activity. Upon seeing his eleven-year-old son playing outside the home, the officers told the child they needed to speak with Belt. At the child's invitation, the officers entered the home—not through the front door, as an ordinary visitor might, but through the kitchen. They did not knock on the kitchen door. Nor did they announce their presence in any way. Rather, chaperoned by the young boy, the officers walked through Belt's kitchen and confronted him in his living room. There they immediately began questioning him about suspected drug activity. His responses to those questions enabled the officers to obtain a warrant, which led to the discovery of methamphetamine manufacturing evidence in a matter of hours.

The majority holds that Belt's responses to the officers' interrogatories constituted intervening acts that severed the causal connection between the officers' illegal entry and the discovery of incriminating evidence. However, Belt's answers to the officers questions came on the heels of their illegal entry into his home as part of an "an uninterrupted course of events." United States v. Watson, 703 F.3d 684, 697 (4th Cir. 2013). And nothing in the record warrants an inference that the officers'

14

discovery of the evidence was "unaffected by the initial illegality"—the officers' illegal entry into his home. Id. at 698. Thus, I cannot agree with the majority's decision to affirm the district court's denial of Belt's motion to suppress on this basis.

Because no intervening acts severed the causal connection between the officers' entry and the discovery of the evidence Belt sought to exclude, the constitutional question in this case is squarely before us. Addressing this question leads to the conclusion the officers' entry into Belt's home violated the Fourth Amendment. No reasonable officer would believe that Belt's eleven-year-old child had authority to consent to the officers' entry into Belt's home, nor does the record establish that the child had actual authority to give such consent.

I.

The majority holds that Belt's motion to suppress was properly denied because the officers' discovery of evidence was too attenuated from their entry, which the majority assumes was illegal. I disagree because the officers' discovery of evidence was part of an "an uninterrupted course of events" arising from their illegal entry. Id.

Evidence discovered as a result of a Fourth Amendment violation is generally subject to suppression under the

15

exclusionary rule. United States v. Andrews, 577 F.3d 231, 235 (4th Cir. 2009). The exclusionary rule is a prudential doctrine meant to "compel respect" for the freedoms guaranteed by the Fourth Amendment. Davis v. United States, 131 S. Ct. 2419, 2426 (2011) (internal quotation marks and citation omitted). By excluding evidence discovered by way of a Fourth Amendment violation, the rule "safeguard[s] against future violations of Fourth Amendment rights through [its] general deterrent effect." Arizona v. Evans, 514 U.S. 1, 10 (1995).

The rule is not without its exceptions, however. Indeed, evidence derived from an illegal search may be admissible where the evidence was not come at "'by exploitation of that illegality'" but instead "'by means sufficiently distinguishable to be purged of the primary taint.'" United States v. Gaines, 668 F.3d 170, 173 (4th Cir. 2012) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)). Thus "where there is sufficient attenuation between the unlawful search and the acquisition of evidence, the 'taint' of that unlawful search is purged." Id.

The Supreme Court has prescribed three factors for determining whether the taint from a Fourth Amendment violation had dissipated: "(1) the time between the Fourth Amendment violation and the [acquisition of evidence], (2) the presence of intervening circumstances, and (3) the flagrancy of the official

16

misconduct." United States v. Hill, 649 F.3d 258, 267 (4th Cir. 2011) (citing Brown v. Illinois, 422 U.S. 590, 603–04 (1975)).

A.

The majority concludes, and I agree, that the first Brown factor quite clearly cuts in favor of suppression. Very little time passed between the officers' illegal entry into Belt's residence and their successful attempt to elicit incriminating statements regarding drug activity in his home. Within two hours, a warrant had been issued and the evidence of methamphetamine manufacturing obtained from Belt's home.

B.

But I part ways with the majority in its application of the second Brown factor—the presence of intervening circumstances sufficient to break the causal chain between the Fourth Amendment violation and the discovery of evidence. The majority relies in large part on this Court's ruling in United States v. Seidman, 156 F.3d 542 (4th Cir. 1998).

In Seidman, after an informant acting as a government agent illegally entered the defendant's home, the informant was greeted by the defendant, who explained that he had not answered the door because he had been in the basement. The defendant then closed the door behind the informant, waived him into his kitchen, and carried on a forty-five minute conversation with him "regarding their families, personal lives, Union business,

17

and [the informant]'s tax dilemma." Id. at 549. In a divided opinion, this Court held that the taint of the informant's illegal entry had been purged by "the intervening independent acts of Seidman shutting the door behind [the informant], motioning [the informant] into his kitchen, and engaging [the informant] in conversation for a substantial period of time." Id. at 550.

Seidman is manifestly distinguishable from this case. Belt did not welcome the officers into his kitchen. He did not shut the door behind them. He did not waive the officers into his living room. Nor did he willingly engage them in lengthy conversation. The officers walked through his kitchen and appeared suddenly and without warning in his living room. They asked questions; he answered them. Nothing suggests that Belt would have engaged the officers in conversation but for their illegal entry into his home. The officers' illegal entry was thus part of an unbroken chain of events leading to the discovery of evidence.

With great respect to my colleagues, I must express my belief that the majority is truly grasping at straws when it suggests that the facts of this case "sufficient[ly]" align with Seidman because Belt "did not ask the troopers to leave." Ante at 9. In Seidman, the defendant's actions made it abundantly clear that he would have welcomed the government informant into

18

his home even if the informant had not let himself in—indeed, the defendant stated that the only reason he did not open the door was because he had been in the basement. Seidman, 156 F.3d at 549. Thus, the defendant's decision to speak to the informant was clearly unaffected by the informant's unlawful entry. The government, which bears the burden of proving that the taint of their unlawful entry had dissipated, id. at 548, has presented no analogous evidence whatsoever in this case.

To read the majority opinion, which repeatedly uses verbiage such as "willing[]" and "consensual" to describe Belt's conversation with the police officers, one would think our task here was to determine whether Belt's statements were voluntary under the Fifth Amendment. However, "[t]his Court and the Supreme Court have consistently held that an analysis of the voluntariness of a statement is a separate inquiry from determining whether the taint from a Fourth Amendment violation has dissipated." Hill, 649 F.3d at 269 (citing Taylor v. Alabama, 457 U.S. 687, 690 (1982) ("[T]his Court [has] firmly established that the fact that a confession may be 'voluntary' for purposes of the Fifth Amendment . . . is not by itself sufficient to purge the taint of an illegal arrest.")). The appropriate inquiry is not whether Belt was physically or otherwise coerced into making incriminating statements. Rather, we must look to whether Belt's statements constituted

19

intervening acts that severed the causal connection between the officers' unconstitutional entry into the home and the discovery of evidence.

Further, particularly when viewed in the context of our precedent, Seidman does not stand for the proposition that voluntary incriminating acts or statements by a defendant necessarily purge the taint of a constitutional violation. In United States v. Gooding, for example, police officers illegally stopped the defendant at a bus stop, suspecting him of carrying drugs. 695 F.2d 78, 84 (4th Cir. 1982). Moments later, the officers requested permission to search his briefcase and flight bag. The defendant opened his briefcase and bag, and actively handed items to the police officers. We held that the defendant's voluntary decision to facilitate the officer's search did not constitute intervening circumstances sufficient to purge the taint of the illegal stop. Id.

Indeed, the Supreme Court itself has found intervening circumstances only where the defendant had the opportunity "to consider carefully and objectively his options and to exercise his free will." Taylor, 457 U.S. at 691. The Supreme Court has therefore found intervening circumstances to have occurred where the defendant appeared at a hearing before a magistrate judge and was advised of his rights, see Johnson v. Louisiana, 406 U.S. 356, 365 (1972), or was arraigned and released from custody

20

for six-days before making incriminating statements, see Wong Sun, 371 U.S. at 491. Under such circumstances, the causal chain between the initial illegality and the defendant's statements is clearly broken. Brown, 422 U.S. at 602.

Here, by contrast, Belt's answers to the officers' questions came after their sudden appearance in his home, on the heels of their illegal entry, and were thus part of an "an uninterrupted course of events." Watson, 703 F.3d at 697. The government has not established that their subsequent discovery of the evidence was "unaffected by the initial illegality." Id. at 698.[1]

Given the absence of intervening circumstances, this Brown factor weighs in favor of suppression.

### C.

The third Brown factor—the flagrancy of the official misconduct—presents a somewhat mixed picture. As the majority notes, the officers' conduct in this case certainly pales in comparison to the egregious misconduct present in some Supreme Court cases. See ante at 10 (collecting cases). On the other hand, we recently held that "flagrancy" within the context of a

---

[1] It should go without saying that refusing to speak with uniformed, armed police officers who suddenly appear in one's living room is an altogether different prospect than declining to do so when they stand outside one's door as a normal visitor would.

21

Fourth Amendment violation is more likely to exist when the police misconduct "involves 'the physical entry of the home, which is the chief evil against which the wording of the Fourth Amendment is directed.'" Hill, 649 F.3d at 270 (quoting Payton v. New York, 445 U.S. 573 (1980)).

The Supreme Court has also directed courts to look to the "quality of purposefulness" of the Fourth Amendment violation to determine whether the taint of that violation is attenuated. Brown, 422 U.S. at 605. The officers in this case purported to rely upon the consent of Belt's eleven-year-old son to gain entry into his home. Upon learning that Belt was home, the officers could easily have knocked on his door, identified themselves, and sought Belt's consent before entering. They chose not to do so. Nor did they ask Belt's son to retrieve his father from the home. These alternatives would have avoided not only violating Belt's Fourth Amendment rights but also the oft-cited safety risks involved when officers confront individuals in their homes without warning. Cf. United States v. Dunnock, 295 F.3d 431, 434 (4th Cir. 2002) (recognizing that the knock and announce rule "(1) protect[s] the safety of occupants of a dwelling and the police by reducing violence; (2) prevent[s] the destruction of property; and (3) protect[s] the privacy of occupants."). Instead, the officers, fully aware that they had not obtained a warrant to search Belt's home, exploited Belt's

22

minor son to gain entrance into the home.  This enabled them to conduct a plain view search of the interior and to question Belt in his living room on their own terms.

Taking the Brown factors together, it must be concluded that the taint from the officers' illegal entry had not dissipated and that the district court thus erred in admitting the challenged evidence on that basis.


II.

Having determined that no intervening circumstances existed, there remains to be addressed what ought to be the central issue in this case—whether the officers' entry into Belt's home on the supposed authority of an eleven-year-old child violated the Fourth Amendment to the United States Constitution.

A.

Although the Fourth Amendment generally prohibits warrantless searches, see Maryland v. Dyson, 527 U.S. 465, 466, (1999), a valid consent to search a residence provides an exception to the usual warrant requirement, see Schneckloth v. Bustamonte, 412 U.S. 218 (1973).  Where the defendant moves to suppress the fruits of a warrantless search, the government bears the burden of establishing, by a preponderance of the

evidence, that it obtained valid consent.  United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007).

It is well-established that consent to search may be obtained from a third party.  However, two criteria must be met for such a consent to be effective.  First, the third party must have authority to consent to the search.  Trulock v. Freeh, 275 F.3d 391, 402-03 (4th Cir. 2001) (citing Stoner v. California, 376 U.S. 483 (1964)).  Second, "the third party's consent must be voluntary."  Id. at 403 (citing Bumper v. N. Carolina, 391 U.S. 543, 548 (1968)).

In United States v. Matlock the Supreme Court held that a third party has actual authority to consent to a search when the third party possesses "common authority over or other sufficient relationship to the premises . . . sought to be inspected."  415 U.S. 164, 171 (1974).  The Court explained:

> The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 172 n. 7 (emphasis added).  Thus, a co-tenant will generally have authority to consent to police searches to the

24

co-tenant's own private rooms or of common areas in the home when other co-tenants are absent or do not object.

Even where the consenting third party lacks "actual authority" to consent, a third party may nonetheless have "apparent authority" if "the facts available to the officer at the moment warrant a person of reasonable caution [to believe] that the consenting party had authority" to consent to the search. Buckner, 473 F.3d at 555 (alterations and quotation marks omitted). Thus, under the apparent authority doctrine, the Fourth Amendment is not violated when officers reasonably, although erroneously, believe that the person who consents to their entry has the authority to do so. Illinois v. Rodriguez, 497 U.S. 177, 188 (1990).

### B.

No Supreme Court case has addressed whether or to what extent the Matlock test applies to minor children who consent to entry into or searches of a parent's home. Nor has this Circuit addressed this issue. Some of our sister circuits, however, have, and in doing so applied the Matlock test in child-consent cases with little to no regard for the special dynamic that such cases present, as though children could be the gatekeepers of their parents' Fourth Amendment rights.

In Lenz v. Winburn, the Eleventh Circuit considered whether a nine-year-old child had authority to consent to her guardian

25

ad litem's entry into her grandparents' home. 51 F.3d 1540 (11th Cir. 1995). The court concluded that the child's age was irrelevant under Matlock. The court reasoned that "the third-party consent rule recognizes that sharing space with another lessens the expectation of privacy in that space," and that "[t]his compromise of the expectation of privacy is no less the case for a minor co-occupant than for an adult." Id. at 1543.

In United States v. Clutter, the Sixth Circuit held that a search of a residence conducted with the consent of a defendant's fourteen-, twelve-, and ten-year-old children was valid. 914 F.2d 775 (6th Cir. 1990). The court found that where the children routinely were left in exclusive control of the house, "the government satisfied its burden of demonstrating that the initial warrantless search of the bedroom was by consent, since the boys enjoyed that degree of access and control over the house that afforded them the right to permit inspection of any room in the house," and the defendants assumed that risk. Id. at 778.

In United States v. Gutierrez-Hermosillo, the Tenth Circuit held that a warrantless search by the police following their admission into the defendant's motel room by his fourteen-year-old daughter was valid. 142 F.3d 1225 (10th Cir. 1998). Analyzing the case through the lens of "apparent authority," the court concluded that the officers could have reasonably believed

26

that the daughter had the authority to allow them to enter the motel room where she appeared to be fourteen years old, she answered the door, and the officers knew that she was traveling with her father. These facts, the court stated, were sufficient to establish the officers' reasonable belief that the daughter had "mutual use" of the motel room and that the defendant "assumed the risk" that she would permit the officers to enter. Id. at 1231. Applying similar reasoning, the Tenth Circuit recently held in United States v. Sanchez that the defendant's fifteen-year-old daughter, who "was home babysitting her younger brother, a task she regularly performed alone," and who thus was "routinely . . . in charge of the family's house," could consent to probation officers' plain-view inspections of the premises. 608 F.3d 685, 689-90 (10th Cir. 2010).

C.

Some lower federal courts and state courts have been less willing to apply such third-party consent reasoning blindly to cases involving minors.

For instance, in Abdella v. O'Toole, officers knocked on the door of the defendant's residence and were greeted by an eleven-year-old child. 343 F. Supp. 2d 129, 134 (D. Conn. 2004). When the officers asked if they could search the upstairs of the home, the child responded by saying, "I don't care." Id. The court assumed arguendo that the statement was

27

tantamount to consent to search and thus analyzed whether the child had authority to grant consent. In framing the Matlock test, the court stated that "the threshold inquiry in finding the common authority necessary for actual third-party authority to consent to a warrantless search of property is whether the owner, co-owner or co-inhabitant of the property has assumed the risk that the third-party will permit the property to be searched." Id. at 135. The court concluded that "[t]here is no basis, on the facts presented here, to conclude that the [parents] assumed the risk that their eleven-year old daughter would permit the police to search their home or personal property." Id.

The Abdella court was highly critical of Lenz, rejecting the Eleventh Circuit's assumption that minors have authority to consent to searches of their parents' homes based merely on their shared access to common areas:

> It is not reasonable or realistic to assume that an eleven-year old child, home alone, has always been authorized to act as an independent co-tenant, such that the parents should be on notice that their expectation of privacy is compromised. The factual record must show some clear sign that the child had responsibility for the home and the property the police desired to search.

Id. at 136-37.

Similarly, in United States v. Barkovitz, a district court held that a twelve-year-old child lacked actual or apparent

28

authority to consent to a search of his father's bedroom. 29 F. Supp. 2d 411, 413-16 (E.D. Mich. 1998). In Barkovitz, officers responded to a "shots fired" call placed by the defendant's neighbor. Id. at 412. When the officers arrived, they noticed a twelve-year-old boy standing on the porch of the defendant's home. The officer's asked the child "Where is the gun?," and the child walked the officers into the home and into his father's bedroom, where his father's gun was kept. Id. The court distinguished the Sixth Circuit's decision in Clutter, noting that there was no evidence that the twelve-year-old was "regularly left alone." Id. at 414. The court concluded, "[t]he government failed to show that [the child] had the actual authority to allow anyone in the house, much less his father's bedroom." Id.

Some state courts have been less willing to find that a child's access to a shared family space imbues the child with actual or apparent authority to allow visitors into the home. Most notably, in People v. Jacobs, 729 P.2d 757 (Cal. 1987), police officers went to the defendant's house and asked his eleven-year-old stepdaughter, who answered the door, if the defendant was home. Id. at 759. The child, who was babysitting her younger siblings at the time, admitted the officers into the "front room" of the residence and told the officers that the defendant would be home in one hour. Id. The officers asked

for a quick tour of the house to confirm the defendant's absence. The child accompanied the officers through the rooms of the house. On the way out, the officers noticed in plain view a television set matching the description of one that had been stolen. The officers seized the set as contraband, and the defendant was later arrested.

In applying the Matlock test, the California Supreme Court noted that the consent given by minor children must be analyzed in light of the disparate levels of authority possessed by parent and child: "Minor children . . . do not have coequal dominion over the family home. Although parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given." Id. at 482. The court stated that "a child cannot waive the privacy rights of her parents" and that the evidence "viewed most favorably to the prosecution, does not support a finding that [the child] had the actual or apparent authority to permit even a superficial survey of the rooms of the house." Id. Rather than establish a per se rule against searches based on a minor's consent, the court recognized that "as a child advances in age she acquires greater discretion to admit visitors on her own authority." Id. at 483. The California Supreme Court also noted that exceptions can allow a minor to consent to, for example, "searches made at

30

the request of a child or when a child is the victim of or a witness to a crime." Id.

D.

While the United States Supreme Court has yet to address whether or to what extent the Matlock test applies to minor children, the Court recently made clear that for purposes of analyzing consent under the Fourth Amendment, the relationship between a parent and a child must be treated differently from that of co-tenants with equal authority over common premises.

In Georgia v. Randolph, the Supreme Court considered whether third-party consent is valid when another co-occupant who is physically present at the scene refuses to consent. 547 U.S. 103 (2006). The Court concluded that "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" Id. at 113. A reasonable visitor would assume that the a resolution must be reached between the co-occupants "through voluntary accommodation, not by appeals to authority." Id. at 114.

On the other hand, the Court said that the Fourth Amendment calculus changes when the relationship between co-occupants is hierarchical in nature, such as that between "parent and child." Id. Common sense dictates that one would not expect that an

31

eleven-year-old child could override the valid consent given by a parent to the search of a common area of the home by raising his or her own objection. The simple fact that a child has joint access to that area of the home does not imbue the child with authority to prevent officers from searching that area when a parent has authorized such a search. This alone suggests that a child fundamentally lacks "joint access or control" even over the common areas of the home within the meaning of Matlock.

A close examination of the principles that underlie the Matlock decision reveals that the mere notion of "joint access" cannot control the outcome in cases such as this one. Indeed, Matlock turned on the premise that when a co-occupant has "joint access or control" over property "for most purposes," it becomes "reasonable to recognize [the co-occupant] has the right to permit the inspection in his own right." 415 U.S. at 172 n.7. This premise breaks down when applied to minor children. As Judge Lucero explained in his separate concurring opinion in Sanchez:[2]

> The common understanding of an adult co-occupant's authority stands in stark contrast to that of a child.

---

[2] While Judge Lucero recognized that the Tenth Circuit's reasoning in Gutierrez-Hermosillo necessitated the outcome reached by the majority, he wrote separately to express his "dismay" with the court's application of "third-party consent principles designed for adult relationships to relationships involving children." Id. at 692.

> Although we would expect a roommate to be free to invite whatever guests she chooses into the shared home, we cannot apply that presumption for most minor children. That is, one normally assumes that a minor child is not allowed to invite guests into the home absent a parent's approval.

Sanchez, 608 F.3d at 694 (Lucero, concurring). Indeed, "[c]hildren do not generally possess authority to permit guests simply because they have joint access to the family home." Id. at 696. Put simply, "[a] child is not a roommate." Id. at 692. Thus, "the default assumption when a minor answers the door should be that the child lacks authority to consent to a home search." Id. 697-98.

Nor can the Eleventh Circuit's age-blind reasoning in Lenz withstand a close reading of Matlock. In Lenz, the Eleventh Circuit viewed the right of a co-occupant to consent to the search of a shared space solely through the lens of "assumption of risk." Yet, in myopically focusing on assumption risk, the court ignored the second and equally significant rationale underlying the Matlock decision. Matlock emphasized that the authority of the co-occupant must be such that he or she has may permit the entry of a visitor "in his own right." 415 U.S. 164, 172 n.7 (emphasis added). Yet, a child's rights to come and go within any area of the home exists at the discretion of his or her parent. Thus, it makes little sense to say that because a child is permitted access to the common areas of a home that the

33

child has authority to grant visitor's access "in his own right." Id. As the California Supreme Court put it:

> It does not startle us that a parent's consent to a search of the living room in the absence of his minor child is given effect; but we should not allow the police to rely on the consent of the child to bind the parent. The common sense of the matter is that the . . . parent has not surrendered his privacy of place in the living room to the discretion of the . . . child.

Jacobs, 729 P.2d at 763 (quoting Lloyd L. Weinrab, Generalities of the Fourth Amendment, 42 U. CHI. L. REV. 47 (1974)). Reasoning to the contrary would lead to the startling and absurd conclusion that Judge Lucero so fervently cautioned against: that "a parent surrenders a portion of her Fourth Amendment rights simply by bearing and raising a child." Sanchez, 608 F.3d at 696.

I would hold that, absent evidence establishing that a child has been given the authority "to permit the inspection [of his parents home] in his own right," Matlock, 415 U.S. at 172 n.7, the government cannot meet its burden in establishing the elements of valid consent under the Fourth Amendment.[3] The mere fact that a child answers the door or has been left home alone will be insufficient.

_____

[3] Like other courts to who have reached similar conclusions, I would recognize exceptions where, for instance, the child's own welfare is at risk.

34

E.

Turning to the undisputed facts of this case, even drawing all inferences in the government's favor, there can be no question that Belt's son lacked actual or apparent authority to grant the officers entry into Belt's home.

The officers approached Belt's residence on an anonymous tip regarding drug activity. The officers encountered a child between the ages of ten and twelve playing outside the home. They learned that this young boy was Belt's son. They learned that Belt was inside the home. The fact-gathering ended there. On this information alone, the officers determined that this child had the authority to admit visitors through a side door into the home, through the kitchen, and into the living room.

That Belt did not chastise his son in front of the officers for letting them in or immediately order the officers to leave tells us very little, if anything, regarding the reasonableness of their conduct. The officers did not ask Belt whether they had permission to be in his home, and we may not imply consent based on Belt's silence alone. See generally WAYNE R. LAFAVE, 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 8.2(b), at 61 (4th ed. 2004) ("[F]or constitutional purposes nonresistance may not be equated with consent.").

The officers could have asked Belt's son to retrieve Belt from the residence. They could have knocked on Belt's front

35

door as an ordinary visitor might and sought to engage Belt in conversation. They did not. Instead, they relied upon the "consent" of Belt's minor child to gain entry into his home, where they then sought to gain incriminating evidence from Belt. In doing so, they violated his Fourth Amendment rights.

## III.

The officers' illegal entry into Belt's home led to the discovery of evidence under circumstances that warrant application of the exclusionary rule. Because, in my view, the district court erred in denying Belt's motion to suppress and should be reversed, I respectfully dissent.